**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SMS ASSIST L.L.C.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 6387** |
| | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **EAST COAST LOT & PAVEMENT** | ) | |
| **MAINTENANCE CORP., NATIONAL** | ) | |
| **MAINTENANCE SYSTEMS, INC., and** | ) | |
| **URI BEN-YASHAR** | ) | |
| | ) | |
| **Defendants.** | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

        SMS Assist L.L.C. ("SMS") is a company that provides maintenance services to corporate

clients by contracting with, and supervising, third parties who perform those services.  In October

2008, Family Dollar Stores, Inc. ("Family Dollar") hired SMS to manage snow removal and de-icing

services ("snow removal services") at Family Dollar stores across the nation during the 2008-2009

snow season.  SMS, in turn, contracted with Defendant East Coast Lot & Pavement Maintenance

Corp. ("East Coast"), owned by Defendant Uri Ben-Yashar, to perform snow removal services for

Family Dollar.  When Ben-Yashar started a new company, Defendant National Maintenance Systems

Inc. ("National"), a few months later, SMS signed an identical contract with National, and National

assumed East Coast's responsibilities under the contract with SMS.

        The collaboration between SMS and Defendants ended poorly, and SMS is now claiming

common law fraud against all Defendants (Count I); claiming breach of contract, breach of oral

agreement, and/or promissory estoppel against East Coast and National (Counts II, III, and IV);

seeking a declaratory judgment against East Coast and National (Count V); and claiming that East

Coast and National are alter-egos of Ben-Yashar (Count VI).  (2d Am. Compl. [87].)  Defendants

have moved for summary judgment on the fraud claim and the alter-ego allegations (Counts I and

VI). (Defs.' Mem. in Support of Their Mot. for Summ. J. as to Counts I and VI [107], hereinafter "Defs.' Mem.")  For the reasons set forth below, Defendants' motion is denied.

## FACTUAL BACKGROUND

SMS manages the provision of floor care, window cleaning, landscaping, and snow plow services for customers across the United States.  SMS is organized under Delaware law and has its principal place of business in Chicago.  (2d Am. Compl. ¶ 1.)  In 2008, SMS had an exclusive contract with Family Dollar to manage all floor care services for approximately 6,700 Family Dollar stores in 44 states.  (Defs.' Reply to SMS' Resp. to Defs.' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Mot. for Summ. J. as to Counts I and VI [131], hereinafter "Defs.' Reply", ¶ 1; Levadnuk Dep.[1] 50:15-17.)  At some point in 2008, Family Dollar Chief Information Officer Josh Jewett, Divisional Vice President of Procurement Hoyt Hackney, and Vice President of Store Operations Colin McGinnis, decided to consolidate the provision and billing of snow removal services for Family Dollar stores at a corporate level.  (Defs.' Reply ¶¶ 2-3; Hackney Dep., Ex. HH to Defs.' Reply, 9:7-11, 18:11-17, 20:7-12, 23:2-7.)

Early in 2008, Brodie Levadnuk, then a Family Dollar employee, sought "preliminary information" from three snow removal organizations that he identified through a Google search.  (Levadnuk Dep. 113:7-24, 114:1-23.)  Levadnuk testified that each organization offered services in "a different way" and with different pricing models.  (Levadnuk Dep. 117:11-16, 118:20-24, 119:1.)  SMS, with whom Family Dollar had a pre-existing relationship—as noted, SMS had an exclusive contract to manage floor care services to Family Dollar—was not among the organizations that Levadnuk researched.  Levadnuk reported to Family Dollar Vice President of Procurement Hackney that he "couldn't make heads or tails" of the snow removal options; once he completed and passed on his preliminary research, Levadnuk had no further involvement in Family

---

[1]     Levadnuk Dep. Refers to Brodie Levadnuk's March 23, 2012 deposition, Ex. F to Defs.' Reply, and his April 16, 2012 deposition, Ex. I to Defs.' Reply.

Dollar's snow removal decision-making. (Levadnuk Dep. 120:11-24, 121:1-2, 122:3-11.) Levadnuk was later hired by SMS in July 2008 to be SMS's Vice President of Operations. (Levadnuk Dep. 5:19-21, 40:4-8.)

In April or May of 2008, Hackney, McGinnis, and SMS's President, Mike Rothman, began discussing the possibility of hiring SMS to consolidate snow removal services for Family Dollar. (Rothman Dep.[2] 89:19-24, 90:4-12.) SMS had provided floor care services for Family Dollar since approximately 2003, but had never managed snow removal services before. (SMS' Disputed and Undisputed Addnl. Material Facts [121], hereinafter "Pl.'s Addnl.", ¶ 3; Levadnuk Dep. 86:17-19, 100:2-4.) On October 10, 2008, Family Dollar and SMS executed a contract for snow removal services ("Addendum C"), initialed by Rothman for SMS and Hackney for Family Dollar. (Hackney Dep. 16:22-24, 17:9-22; Ex. R to Defs.' Local Rule 56.1 Statement of Undisputed Facts in Support of Mot. for Summ. J. as to Counts I and VI [106], hereinafter "Defs.' 56.1".)

As Addendum C was not signed until October 2008, SMS had little time to set things up before the 2008-2009 snow season. Accordingly, SMS decided to seek out a "national" snow removal company that could find and manage local subcontractors working at each Family Dollar store throughout the nation. (Pl.'s Addnl. ¶ 6.) At the recommendation of someone he knew through trade associations, SMS's President, Rothman, contacted East Coast's President, Uri Ben-Yashar, in the summer of 2008 about the possibility of East Coast's providing snow removal services to Family Dollar.[3] (Pl.'s Addnl. ¶ 7; SMS' Resp. to Defs.' Local Rule 56.1 Statement of Undisputed Facts in Support of Mot. for Summ. J. as to Counts I and VI of 2d Am. Compl. [121],

---

[2]     Rothman Dep. refers to Michael Rothman's April 14, 2012 deposition, Ex. G to Defs.' Reply. Rothman Dep. II refers to his May 4, 2012 deposition, Ex. J to Defs.' Reply.

[3]     According to Levadnuk, Bob Lessack, the person who suggested Ben-Yashar to Rothman, told Rothman and Levadnuk either by conference call or in person that East Coast was a national company that had Rite Aid as a customer. (Levadnuk Dep. 152-54.)

hereinafter "Pl.'s 56.1", ¶ 20; Ben-Yashar Dep.[4] 23:11-24.)

Rothman and Ben-Yashar signed an Affiliate Agreement between SMS and East Coast on October 31, 2008. (East Coast Affiliate Agreement, Ex. L to Defs.' Reply, at 11.) The Agreement stated that it "constitute[s] the sole and only agreement between SMS Assist and [East Coast] respecting the work herein covered and the subject matter of this Agreement. Any prior agreement or conditions . . . whether written or oral negotiations or bid proposals, unless specifically made a part hereof are null and void." (East Coast Affiliate Agreement at 10.) It also set out prices for each snow removal service based on the square footage of the area serviced. (East Coast Affiliate Agreement at 14.)

In December 2008, Ben-Yashar requested that SMS permit his newly-formed business, National, to perform the Family Dollar snow removal work in place of East Coast. (2d Am. Compl. ¶ 28; Pl.'s Addnl. ¶ 15.) Ben-Yashar intended for East Coast to do "self-performing" work—work done by East Coast's own employees—and for National to manage subcontractors. (Ben-Yashar Dep. 135:2-7.) Rothman agreed to allow National to assume East Coast's obligations under the Affiliate Agreement with SMS, "as long as East Coast supports [the new company], and [Ben-Yashar] supports it." (Rothman Dep. II 147:17-24.) Rothman and Ben-Yashar signed an Affiliate Agreement between SMS and National on December 18, 2008 that is identical to the East Coast Affiliate Agreement. (National Affiliate Agreement, Ex. D to 2d Am. Compl.) SMS now asserts that, in reliance on various misrepresentations made by Ben-Yashar, it entered into three contracts: (1) Addendum C with Family Dollar to provide snow services based on the prices provided by Ben-Yashar; (2) an Affiliate Agreement with East Coast to invoice East Coast's snow services for Family Dollar on a per-square-foot model; and (3) the identical Affiliate Agreement with National. (Pl.'s Addnl. ¶ 14.)

---

[4] Ben-Yashar Dep. refers to Uri Ben-Yashar's March 23, 2012 deposition, Ex. D to Defs.' Reply, and his May 17, 2012 deposition, Ex. Q to Defs.' Reply.

Defendants contend that Ben-Yashar provided SMS with accurate information and made no misrepresentations. Defendants also assert that Rothman had a conversation lasting less than one hour with Ben-Yashar before signing the East Coast Affiliate Agreement; did not ask Ben-Yashar for any references; did not ask for the names of any subcontractors who had worked with East Coast; did not ask for any financial documents; and did not perform due diligence before entering into the Affiliate Agreement, even though it concerned SMS's largest customer, Family Dollar, which represented "roughly 80%" of SMS's business. (Defs.' Reply ¶ 24.) Defendants note Levadnuk's testimony that his first conversation with Ben-Yashar, which also included Rothman, was "around" an hour long. (Levadnuk Dep. 175:6-16.) For their part, Rothman and Levadnuk admit that they did not call any references for East Coast before entering into the contract with East Coast. (Rothman Dep. 135:17-24; Levadnuk Dep. 176:5-18.)

## A. Defendants' Experience in Snow Removal Projects

Before October 2008, East Coast had performed snow removal services since 1996 on locations in Massachusetts, Rhode Island, Connecticut, Pennsylvania, and New York. (Defs.' Reply ¶ 16; Ben-Yashar Dep. 25:21, 26:2-11.) East Coast and National are Rhode Island corporations with their principal place of business in Pawtucket, Rhode Island. (2d Am. Compl. ¶ 3.) Defendants admit that as of 2008, East Coast "was a small regional business" that worked primarily in Rhode Island and Massachusetts, with an office in Connecticut and a small office on Long Island. (Defs.' Reply ¶ 16.) East Coast had never performed snow removal for more than 600 total stores in any single year, had never performed snow removal outside its local region, and had never remotely managed more than 100 subcontractors. (Defs.' Reply ¶ 21; Ben-Yashar Dep. 30:14-17.)

The parties dispute what representations Ben-Yashar made to SMS concerning East Coast's experience in snow removal. According to SMS, Ben-Yashar told Rothman and Levadnuk in October 2008 that East Coast performed snow services on a national basis. (Pl.'s Addnl. ¶ 7; 2d Am. Compl. ¶ 12; Levadnuk Dep. 173:19-20, 177:7-9, 178:24.) In particular, Levadnuk testified

that Ben-Yashar e-mailed Rothman and Levadnuk a PowerPoint presentation on October 7, 2008, to explain how Ben-Yashar supposedly ran his "national" business serving Rite Aid Corp. ("Rite Aid"), a nationwide drugstore chain.  (2d Am. Compl. ¶ 13; Levadnuk Dep. 351:13-19; Rothman Dep. 91:19-20.)

Ben-Yashar testified that he did not recall telling SMS that East Coast had performed snow removal services on a nationwide basis, but in his understanding, "national" means "servicing more than one state and working with [a] national retailer within a national chain." (Ben-Yashar Dep. 104:1-7, 105:2-4).  For example, Ben-Yashar testified, work done at locations in both Rhode Island and Massachusetts could be characterized as "national" work.   (Ben-Yashar Dep. 104:15-16.) Under Ben-Yashar's definition of "national," therefore, East Coast had performed snow removal nationally before 2008.

SMS also alleges that Ben-Yashar falsely claimed in October 2008 that East Coast had performed snow removal services for Rite Aid.   (Pl.'s Addnl. ¶ 7; Levadnuk Dep. 174:1-4.) Defendants admit that East Coast never performed snow services for Rite Aid.  (Defs.' Reply ¶ 19; Ben-Yashar Dep. 69:4-7.)  According to Defendants, Ben-Yashar merely showed Rothman and Levadnuk a bid proposal that East Coast had submitted to Rite Aid, and Rothman erroneously assumed that East Coast had won the contract and had performed snow services for Rite Aid. (Defs.' Reply ¶ 7.)

Plaintiff asserts that Ben-Yashar repeatedly misrepresented to Rothman and Levadnuk during "ongoing communication[s]" in the fall of 2008 that East Coast could provide nationwide snow services through its existing subcontractor network.  (Pl.'s Addnl. ¶ 8; Rothman Dep. II 95:11-24, 96:1-9.)  According to Defendants, however, Ben-Yashar merely told SMS that East Coast had experience managing remote subcontractors in different parts of the Northeast, and that managing remote subcontractors across the country would be "the same."  (Ben-Yashar Dep. 114:1-6.) According to Defendants, Ben-Yashar never represented that East Coast could provide

nationwide service for Family Dollar through its existing subcontractor network.  (Defs.' Reply ¶ 8.)

### B.    Defendants' Billing Method for Services

Ben-Yashar proposed to SMS that Defendants should bill SMS for snow removal services at a set price per square foot.  (Defs.' Reply ¶ 11.)  On September 27, 2008, Ben-Yashar e-mailed Levadnuk, stating that the prices he proposed to SMS were based on competitive "sample prices from my contractors nation wide," allowing him to "c[o]me out with this national model" for snow removal pricing.  (September 27, 2008 e-mail from Ben-Yashar to Levadnuk, Ex. 11 to Pl.'s 56.1; Pl.'s Addnl. ¶ 13.)  SMS agreed to a per-square-foot pricing model in the East Coast and National Affiliate Agreements.

SMS now alleges that Ben-Yashar falsely represented that Defendants' pricing model was "standard and national pricing" that was "competitive in the industry."  (Pl.'s Addnl. ¶ 11.)  In reality, Plaintiff alleges, the standard pricing model is "bucket" pricing, in which each store is "placed in a bucket representing a range of square footages . . . and billed the same price per service as each store in its bucket" rather than being billed on a per-square-foot basis.  (Pl.'s Addnl. ¶¶ 17-18.)  According to Plaintiff, Ben-Yashar also misrepresented to Levadnuk and Rothman that East Coast used a per-square-foot pricing model to bill Rite Aid for snow services, when in fact East Coast had relied on a "bucket" pricing model in its unsuccessful proposal to Rite Aid.[5]  (Pl.'s Addnl. ¶¶ 13, 20.)  Though he refused to label his Rite Aid proposal as "bucket" pricing, Ben-Yashar testified that for his Rite Aid proposal, he "divide[d] [stores] in three categories" based on square footage, and provided prices based on those store categories.  (Ben-Yashar Dep. 63:10-15.)

Ben-Yashar testified that a per-square-foot pricing model was "fair pricing" for the Family Dollar project, since time constraints prevented Defendants from measuring the size of each lot to

---

[5]        A copy of the pricing component of Defendants' proposal to Rite Aid is not in the record.  A version of the Rite Aid proposal that says nothing about pricing is included in the record as an attachment to an e-mail Ben-Yashar sent Levadnuk and Rothman on October 7, 2008.  (Rite Aid Presentation, Ex. 10 to Pl.'s 56.1.)

determine a different pricing scheme before the snow season began. (Defs.' Reply ¶ 11.) He asserts that he shared other potential billing methods with Rothman, and that Rothman was aware of alternative pricing models by virtue of the research into snow removal services that Levadnuk had performed when Levadnuk worked for Family Dollar. (Ben-Yashar Dep. 39:9-23.) According to Defendants, Ben-Yashar informed Plaintiff that the pricing model would be "a little high" and warned that SMS would have to "pay a premium" because it was seeking subcontractors for snow removal so late in the season. (Defs.' Reply ¶ 12.) Defendants also assert that there is no standard pricing model for snow removal. (Defs.' Reply ¶ 11.) As evidence that no standard model exists, Defendants rely on both Levadnuk's admission that each company he researched during his initial inquiries for Family Dollar priced the services in a different way, and on Rothman's testimony at his deposition that he was not aware of a national pricing model, government regulation of pricing, or laws related to the pricing of snow removal services. (Rothman Dep. 122:17-24, 123:1.)

### C. Defendants' Technical Capabilities

On October 7, 2008, Ben-Yashar e-mailed portions of a PowerPoint presentation that East Coast had prepared for Rite Aid to Rothman and Levadnuk. The presentation discussed "Web-based [work order] generation" and an "IVR [integrated voice-recognition] controlled system" that would help to validate subcontractors' snow services. (Pl.'s Addnl. ¶ 10; Rite Aid Presentation at 5-6.) Plaintiff asserts that Ben-Yashar misrepresented to Levadnuk and Rothman that East Coast already had those technological capabilities. (Pl.'s Addnl. ¶ 24.) In addition, Plaintiff alleges that Ben-Yashar falsely assured SMS in the fall of 2008 that East Coast had the necessary billing and operational infrastructure to undertake the Family Dollar job. (Pl.'s Addnl. ¶ 8.)

Defendants contend that the Rite Aid presentation Ben-Yashar shared with Rothman and Levadnuk did not state that East Coast *already had* the disputed technological capabilities, and that Rothman mistakenly assumed the presentation concerned East Coast's existing capabilities rather

than its potential capabilities. (Defs.' Reply ¶ 24.) As evidence that any representations Ben-Yashar made about East Coast's capability to handle the Family Dollar job were accurate, Defendants also rely on the fact that East Coast did have "a programmer on stand-by to put East Coast in a position to fulfill the . . . program." (Defs.' Reply ¶ 24.)

Plaintiff also alleges that the method Defendants used to generate bills was insufficient to handle the Family Dollar project. (Pl.'s Resp. ¶ 29.) Defendants admit that they "needed to ramp up to be able to do" the work anticipated in the Affiliate Agreement with SMS. (Defs.' Reply ¶ 23.) Indeed, "[p]rimarily in response to the opportunity" with SMS and Family Dollar, Ben-Yashar hired Bill Sturm as an operations manager in October 2008 to "take [the business] to the next level, to take it nationwide." (Defs.' Reply ¶ 23.) At the time Ben-Yashar hired Sturm, East Coast billed services by manually entering data into spreadsheets, rather than relying on a computer system. (Pl.'s Addnl. ¶ 29.) Nonetheless, Defendants note that "SMS created the billing procedures, billing templates, and methodology" that East Coast and National used for the Family Dollar snow removal work; Defendants argue that any inadequacies in the billing method were therefore attributable to SMS. (Defs.' Reply ¶ 30.) An employee of East Coast and National, Carol Lincoln, testified that SMS told Defendants to use a particular form for billings, and that SMS had "protocol and processes" for billing. (Lincoln Dep., Ex. AA to Defs.' Reply, 84:18-23, 164:7-11.) SMS also required Defendants to follow a template which listed what information needed to be included with each invoice. (November 21, 2008 e-mail from Levadnuk to Michael Rahini, Ex. SS to Defs.' Reply, at SMS0105450.)

D.    **Schematic Diagrams**

The parties dispute what obligations the Affiliate Agreements imposed on East Coast and National concerning schematic diagrams of each Family Dollar lot.   The East Coast Affiliate Agreement states:

> East Coast will provide SMS Assist with a schematic diagram of each [Family Dollar] store that outlines the areas by square footage that will be serviced.   SMS Assist and East Coast will use their best efforts to confirm that the schematic diagram information is accurate, and if not make the necessary modifications.   It shall not be required, however, that an agreed upon schematic diagram be in place before East Coast can begin [performing snow services].   This schematic diagram effort will be completed within 30 days of the signing of this Agreement [October 31, 2008].

(East Coast Affiliate Agreement at 12.)   SMS's contract with Family Dollar for the 2008-2009 snow season, Addendum C, contained identical language obligating SMS to provide Family Dollar with schematic diagrams.   (Addendum C, Ex. R to Defs.' 56.1, at SMS0025580.)[6]   According to SMS, the Affiliate Agreements required Defendants to "properly invoice SMS for verified services based upon accurate schematic diagrams reflecting the parking lot and sidewalk areas" of each Family Dollar store serviced.   (Pl.'s Addnl. ¶ 14.)   The square footage for each store could only be ascertained by looking at schematic diagrams, SMS alleges.   (Pl.'s Addnl. ¶ 28.)

SMS asserts that from November 2008 until March 2009, Defendants misrepresented that their billings were based upon schematic diagrams, when in fact Defendants had schematic diagrams for only four of the more than 800 Family Dollar stores serviced.   (Pl.'s Addnl. ¶ 26; 2d Am. Compl. ¶¶ 27, 32; March 27, 2009 e-mail from Sturm to Levadnuk, Ex. 12 to Pl.'s 56.1.) Defendants acknowledge that they did not obtain diagrams for all the stores.   (Defs.' Reply ¶ 26.) Instead, various subcontractors working for Defendants surveyed store sites and determined the square footages of each lot, but the record includes no information concerning the timing or methods of those determinations.   (Lincoln Dep. 55:1-4.)   Sturm testified that Defendants relied on

---

[6]    The record does not specify when SMS provided Defendants with a copy of its agreement with Family Dollar, Addendum C.

site surveys performed by Defendants' subcontractors in preparing invoices. (Sturm Dep., Ex. PP to Defs.' Reply, at 25:10-17, 26:5-7; Lincoln Dep. 67:12-21.)

According to Plaintiff, Ben-Yashar represented to Rothman and Levadnuk throughout the 2008-2009 snow season that Defendants' subcontractors had measured the square footage of each store's lot before Defendants began performing snow services on November 17, 2008, and that Defendants would provide schematic diagrams for each store. (2d Am. Compl. ¶ 25.) Levadnuk testified that in phone conversations, Ben-Yashar repeatedly promised that Defendants would provide him with the schematic diagrams, but Defendants never did. (Levadnuk Dep. 478: 6-23.) According to SMS, it learned "late in the season" that Defendants did not have schematic diagrams for "almost any" stores, and insisted that Defendants create them immediately. (Pl.'s Addnl. ¶ 40.)

In February 2009, Family Dollar identified a number of erroneous square footages in invoices, and noted the "very time consuming process" of validating invoices "due to the failure of having a complete and accurate schematic for each location as agreed to." (February 18, 2009 e-mail from Family Dollar Senior Sourcing Manager Bryan Rothmeyer to Levadnuk and Hackney, Ex. 30 to Pl.'s 56.1.) Levadnuk e-mailed Ben-Yashar on March 14, 2009, asking, "Where are we on the schematic of each store?" (March 14, 2009 e-mail from Levadnuk to Ben-Yashar, Ex. 31 to Pl.'s 56.1.) A few days later, Family Dollar again complained that "we are still dealing with issues from incorrect [lot size] survey data," and reminded Levadnuk that "[b]y contract the surveys of all stores were to be completed" within thirty days. (March 17, 2009 e-mail from Hackney to Levadnuk and Rothmeyer, Ex. 30 to Pl.'s 56.1.) In fact, both the Affiliate Agreement between Defendants and SMS and the contract between SMS and Family Dollar ("Addendum C") were signed in October 2008 and contained identical language about the schematic diagrams.

Ten days later, Levadnuk e-mailed Defendants' operations manager, Sturm, writing that SMS "need[ed] the schematics to prove and validate" lot sizes for billing, and that "drawings or diagrams" were important for SMS. Sturm's response makes clear that Defendants did not have

diagrams of the stores. Sturm told Levadnuk that subcontractors hired by National to provide the snow removal services had balked at re-surveying lot sizes to produce drawings, rather than just square footages. He wrote, "I suggest that we insist on drawings only for stores for which there is considerable discrepancy" between what the subcontractor, store manager, and "corporate" say should be plowed. (March 27, 2009 e-mail from Sturm to Levadnuk.)

Defendants now assert that the Affiliate Agreements did not require them to produce diagrams for each store. The Agreements "do not provide a definition of 'schematic,'" Defendants contend (Defs.' Reply ¶ 26), though both Levadnuk and Sturm testified that, to them, a "diagram" meant a "drawing." (Pl.'s Addnl. ¶ 27.) Defendants take the position that accurate invoicing only required knowledge of the square footage of each store, which Defendants assert they had. (Defs.' Reply ¶ 26.) Defendants further allege that the Affiliate Agreements required only that Defendants use "best efforts" to provide the schematic diagrams, (Defs.' Reply ¶ 14; Ben-Yashar Dep. 155:4-19, 156:6-16), and that Defendants could verify square footages through "[a]lternative methods such as . . . the use of Google Earth satellite imagery." (Defs.' Reply ¶ 28.) According to Defendants, all parties understood "from the inception of the [snow removal] program that validation of the square footages provided by the subcontractors would be [done through] . . . satellite based systems." (Defs.' Reply ¶ 28.) Defendants assert that SMS did not ask for "diagrams" until March 2009, when "the snow season was winding down." (Defs.' Reply ¶ 27.)

### E.    Billing Disputes

According to SMS, the invoices East Coast and National submitted to SMS throughout the 2008-2009 snow season were riddled with duplicate entries and incorrect square footages, and lacked required verification paperwork. (Pl.'s Addnl. ¶ 25.) Levadnuk testified that he alerted Defendants of invoice errors after receiving the very first invoice from East Coast on November 26, 2008. (Levadnuk Dep. 406:8-22; Pl.'s 56.1 ¶ 53.) According to Levadnuk, the invoices Defendants submitted were "blatantly wrong"; they included inconsistent square footages on the same invoice,

12

and errors that amounted to discrepancies of a hundred million square feet in billings. (Levadnuk Dep. 320:12-16, 321:16-22, 480:7-13.) Levadnuk testified that he also argued by e-mail at some point with Ben-Yashar that square footages in invoices were wrong, but Ben-Yashar claimed "[h]is people were right and I'm wrong." (Levadnuk Dep. 479:10-24, 480:1-17.) SMS alleges that it paid Defendants and then invoiced Family Dollar based on Defendants' erroneous bills, resulting in damage to SMS's relationship with Family Dollar. (Pl.'s Addnl. ¶ 40.) The situation was so bad, Levadnuk testified, that Defendants "never" sent a consistent and accurate invoice, and many invoices were "grossly wrong." (Levadnuk Dep. 326:9-10, 480:13.)

Family Dollar was also not satisfied with the services provided by Defendants. A Family Dollar employee, Erica Rhodus, testified that problems included Defendants' failure to perform snow services when needed; failure to pay subcontractors who actually performed the snow removal services; reporting excessive square footage for stores; and providing excessive service, such as removing snow at some locations ten times in a single day. (Rhodus Dep., Ex. 24 to Pl.'s 56.1, at 54-56.) Family Dollar became concerned about Defendants' excessive snow removal charges as early as November 2008. Rhodus recalled, for example, being charged "$800 for one service to go out and put down salt" at a single store. (Rhodus Dep. 56:5-15, 57:13-18.)

On December 16, 2008, Levadnuk e-mailed Carol Lincoln, complaining that invoices submitted by Defendants were inaccurate and would be rejected by Family Dollar. (December 16, 2008 e-mail from Levadnuk to Lincoln, Ex. 28 to Pl.'s 56.1.) Lincoln worked as a "controller" for both East Coast and National in their shared accounting department, splitting her time between the two companies. (Ben-Yashar Dep. 145:2-9.) Levadnuk testified that he repeatedly notified Lincoln of errors he found in Defendants' invoices throughout the 2008-2009 snow season. (Levadnuk Dep. 406:8-22.) In late December 2008, Family Dollar discovered that Defendants were submitting invoices with grossly inaccurate lot sizes, such as listing a 16,000 square foot lot as being 76,800 square feet in size. (Rhodus Dep. 58:8-24.) On December 30, 2008, Levadnuk e-mailed

13

Ben-Yashar, Sturm, and Lincoln to inform them that Family Dollar questioned the lot sizes that Defendants supposedly serviced. Levadnuk wrote, "[Family Dollar members] are stating that there is no way the sidewalks and parking lots are that big . . . [and] have even gone to the length of calling some of these stores and asking them to measure." (December 30, 2008 e-mail from Levadnuk to Lincoln, Ben-Yashar, and Sturm, Ex. 14 to Pl.'s 56.1.)

In early January 2009, Levadnuk complained to Lincoln that "the data that is on the invoices are so inconsistant [sic] and the data entry is so bad, that . . . it takes me almost 4 full days to validate one invoice. One example is that the same store on the same invoice has 3 different parking lot and sidewalk sizes." Levadnuk continued, "I could and would not ever send this to [Family Dollar] due to the errors and problems." (January 9, 2009 e-mail from Levadnuk to Lincoln, Ex. 28 to Pl.'s 56.1.) According to Levadnuk, Lincoln herself never identified any invoice errors, and expressed "amazement" when he pointed them out errors to her. (Levadnuk Dep. 406:23-24, 407:1-3.)

On January 29, 2009, Sturm e-mailed Levadnuk, acknowledging that current information about store lot sizes appeared to be inaccurate. (January 29, 2009 e-mail from Sturm to Levadnuk, Ex. 28 to Pl.'s 56.1.) Levadnuk replied that Defendants' invoices listing lot sizes of 99,999 square feet were "definitely wrong." Levadnuk added that Family Dollar had already refused to pay invoices SMS passed on from Defendants because their content was "grossly wrong." (January 30, 2009 e-mail from Levadnuk to Sturm, Ex. 28 to Pl.'s 56.1.)

In February 2009, SMS informed Family Dollar that it was withholding payment to Defendants for all invoice line items for sidewalks that were reportedly larger than 2,000 square feet until those dimensions could be verified—a total of more than 2,000 line items. (February 18, 2009 e-mail from Levadnuk to Rothmeyer, Ex. 30 to Defs.' 56.1.) Levadnuk also e-mailed Lincoln in February that "about 50% of the first 100 lines" of an invoice submitted by Defendants to SMS were duplicate entries from past invoices. (February 16, 2009 e-mail from Levadnuk to Lincoln, Ex. 28

14

to Pl.'s 56.1.)  Rhodus testified that Family Dollar received phone calls "every day" from stores and subcontractors complaining about missing services or payments "well into spring" of 2009.  (Rhodus Dep. 59:23-24.)

Levadnuk testified that Defendants "just would not change" their practices in spite of numerous requests from SMS for invoice corrections.  (Levadnuk Dep. 409:8-14.)  According to Levadnuk, Defendants continued to send invoices "with that same [flawed billing] methodology" despite Levadnuk's repeated complaints about and explanations of the flaws.  (Levadnuk Dep. 415:4-6.)  Defendants "knowingly sent duplicates, sent wrong information," Levadnuk testified. (Levadnuk Dep. 415:6-8.)

Defendants admit that their invoices contained errors, but reply that East Coast and National "worked cooperatively [with SMS] to assure the accuracy and completeness of each invoiced service" and "made every correction" that was necessary.  (Defs.' Reply ¶ 25.)  But Lincoln herself observed in a December 29, 2008 e-mail that she knew entering work orders in a way that allowed her to "weed out duplicate work orders" was "not currently a priority" for Ben-Yashar.[7]  (December 29, 2008 e-mail from Lincoln to Ben-Yashar, Ex. 16 to Pl.'s 56.1.)  Similarly, in early April 2009, Sturm warned Ben-Yashar that Defendants' billing methodology had resulted in an approximate 30% error rate.  (Pl.'s Addnl. ¶ 31; April 5, 2009 e-mail from Sturm to Ben-Yashar, Ex. 13 to Pl.'s 56.1.)  In an October 19, 2009 e-mail to Ben-Yashar, Lincoln estimated that the error rate on invoices submitted to SMS ranged from 2% to 20%.  (October 19, 2009 e-mail from Lincoln to Ben-Yashar, Ex. 17 to Pl.'s 56.1.)  While Defendants allege that they worked to correct each invoice error (Defs.' Reply ¶ 32), Plaintiff insists that Defendants never "reconciled their invoices with what actually should have been billed."  (Pl.'s Addnl. ¶ 33.)  Defendants themselves admit that they "did not complete the reconciliation process" for the 2008-2009 snow season, but contend that this was

---

[7]     The context for the e-mail is not in the record.

because "SMS quit paying" them.  (Defs.' Reply ¶ 33.)

On February 6, 2009, SMS agreed to modifications in its agreement with Family Dollar that, according to Levadnuk, "reduced the cost of the snow plow service to Family Dollar" by approximately 30%.  (February 18, 2009 e-mail from Levadnuk to Rothmeyer, Ex. 30 to Pl.'s 56.1.) Defendants also agreed to a price reduction that (1) capped snow service charges at 10,000 square feet per location, and (2) increased the snowfall threshold required before rural stores would be serviced.   (East Coast and National Counterclaim, Ex. 25 to Pl.'s 56.1, hereinafter "Counterclaim", ¶¶ 30, 32-34.)  Even with these concessions, on February 18, 2009, Family Dollar demanded a 20% further reduction in the price of snow plow services being provided from SMS, asserting that it was "imperative that Family Dollar gets our spend [sic] adjusted to a more realistic level for the balance of this winter season."  (February 18, 2009 e-mail from Family Dollar Senior Sourcing Manager Bryan Rothmeyer to Levadnuk and Hackney, Ex. 30 to Pl.'s 56.1.)  In March 2009, a Family Dollar employee informed Levadnuk that he had instructed employees to discount SMS's snow removal invoices by 20%, citing "the implications of a single [Family Dollar] store paying $21,000 in one month for snow removal."  (March 17, 2009 e-mail from Hackney to Levadnuk and Rothmeyer, Ex. 30 to Pl.'s 56.1.)

### F.    Negotiations for 2009-2010 Snow Season

In April 2009, SMS told Defendants that SMS planned to renew its contract with Family Dollar for 2009-2010 and to issue Family Dollar a rebate on snow removal services. (Counterclaim ¶¶ 36-37.)  At some point on or before April 27, 2009, Plaintiff alleges, in a phone conversation with Rothman, Ben-Yashar agreed that Defendants would accept a lower payment from SMS than what Defendants had invoiced, would pay all open subcontractor invoices, and would issue a $1,000,000 rebate/credit to Family Dollar in exchange for renewal of National's Affiliate Agreement (with lowered pricing terms) for the next snow season.  (Pl.'s Addnl. ¶ 34; April 27, 2009 e-mail from Rothman to Ben-Yashar, Ex. 21 to Pl.'s 56.1; September 23, 2009 e-mail from

Rothman to Ben-Yashar, Ex. KK to Defs.' 56.1; Counterclaim ¶¶ 37, 39.)  Plaintiff asserts that Defendants actually "had no intention" of performing this agreement, but represented that they intended to perform it.  (Pl.'s Addnl. ¶ 34.)

On April 27, 2009, Ben-Yashar wrote in an e-mail to Rothman that Defendants would provide the proposed rebate subject to (1) confirmation of SMS's renewed snow removal contract with Family Dollar; (2) signed renewal of the contract between SMS and National; and (3) confirmation that Family Dollar received a rebate from SMS before "I [Ben-Yashar] give my 1 Million."  (April 27, 2009 e-mail from Ben-Yashar to Rothman, Ex. 21 to Pl.'s 56.1.)  SMS and Family Dollar modified their snow removal services agreement by a written addendum ("Addendum D") on July 7, 2009, which provided that SMS would give Family Dollar $1,163,496.60 in service credits and a check for $400,000.  (Addendum D, Ex. E to 2d Am. Compl., at ¶ 12; Hackney Dep. 28:11-16, 34:14-18, 37:9-13.)  Addendum D also extended SMS's provision of snow removal services to Family Dollar through May 1, 2010 under a "bucket" pricing scheme. (Addendum D ¶¶ 2, 14.)  According to Rothman, SMS "relied upon [Defendants'] promise to fund the [$1,000,000] rebate [to Family Dollar] when we [SMS] entered into the [Addendum D] agreement with Family Dollar, which addendum you [Ben-Yashar] reviewed and agreed to in advance of our execution of the same."  (September 23, 2009 e-mail from Rothman to Ben-Yashar, Ex. KK to Defs.' 56.1.)

Defendants assert that Ben-Yashar's agreement to the proposed renewal deal was always conditional, and that Plaintiff's claim that Defendants "had no intention" to perform the agreement is inaccurate.  (Defs.' Reply ¶ 34.)  Ben-Yashar e-mailed Rothman several times between April 2009 and September 2009 to lay out his conditions for offering a rebate to Family Dollar before Ben-Yashar ultimately rejected the renewal deal.  (April 27, 2009 e-mail from Ben-Yashar to Rothman, Ex. 21 to Pl.'s 56.1; September 18, 2009 e-mail from Ben-Yashar to Rothman, Ex. 35 to Pl.'s 56.1.)  In an e-mail as late as September 18, 2009, Ben-Yashar told Rothman that the two of

them still "ha[d] to make a decision" about any potential rebate, outstanding billings and a possible joint venture between SMS and National for 2009-2010. (September 18, 2009 e-mail from Ben-Yashar to Rothman.) Ben-Yashar warned that if his conditions were not met, "there is no rebate, [and] I will send you . . . the full final bill and expect payment." (*Id.*) On September 30, 2009, Ben-Yashar refused to renew the Affiliate Agreement between SMS and Defendants. He also demanded payment from SMS for the full amount of Defendants' outstanding billings. (Defs.' Reply ¶ 35; September 30, 2009 e-mail from Ben-Yashar to Rothman, Ex. 36 to Pl.'s 56.1.)

### G. Defendants as Alter-Egos

Ben-Yashar is the President and Treasurer of East Coast, owner of 50% of East Coast's capital stock, and one of two members of East Coast's Board of Directors. His wife, Deganit Ben-Yashar, owns the remaining East Coast stock, and is the only other member of its Board. (2d Am. Compl. ¶ 5.) At his deposition, Ben-Yashar was "not sure" whether he was sole owner of East Coast, or whether his wife was also an owner, because "[t]he lawyers did it." (Ben-Yashar Dep. 9:24, 10:1-6.) Ben-Yashar is also the President and sole Board Member of National, and he owns 100% of National's capital stock. (2d Am. Compl. ¶ 5.) Ben-Yashar was paid a salary by East Coast "in the neighborhood of $100,000." (Ben Yashar Dep. 14:13-21.) East Coast also paid Ben-Yashar's entire cell phone bill and his expenses for business travel. (Ben-Yashar Dep. 17:1-22.) Ben-Yashar testified that East Coast paid for "most of my fuel" for the car he drives,[8] and for his car insurance. (Ben-Yashar Dep. 18:2-8.) (Another one of Ben-Yashar's business entities paid for the cost of the car itself. (Ben-Yashar Dep. 18:9-12.))

According to Plaintiff, Ben-Yashar dominated both East Coast and National, and strictly controlled the companies' communications. As evidence, Plaintiff relies on a December 20, 2008 e-mail from Ben-Yashar to Sturm stating that "I [Ben-Yashar] DO NOT want anyone to

---

[8] The record does not state that the car was used for both business and personal use, but the court reads Ben-Yashar's testimony to imply that it was.

communicate out information. How many times do I have to say that? How many times before you guys get it?!!!!!" (December 20, 2008 e-mail from Ben-Yashar to Sturm and O. Casey,[9] Ex. 15 to Pl.'s 56.1.) Ben-Yashar admitted that he did not want anyone other than him communicating with SMS about problems. (Ben-Yashar Dep. 208:17-23.) Plaintiff further alleges that Ben-Yashar referred to East Coast and National interchangeably, including on billing records. (Pl.'s Addnl. ¶ 39; February 2, 2010 e-mail from Lincoln to Charles Kirwan, Ex. 20 to Pl.'s 56.1.) In one e-mail Ben-Yashar sent Rothman, he also referred to the $1,000,000 potential rebate from Defendants to Family Dollar as "my 1 Million." (April 27, 2009 e-mail from Ben-Yashar to Rothman.)

As evidence that East Coast and National are legitimate corporate entities rather than alter-egos of Ben-Yashar, Defendants rely on evidence of East Coast and National's corporate formalities and independence from each other. Defendants assert that the companies are registered separately with the Secretary of State and with the IRS, that they maintain separate checking accounts, and that they file separate tax returns. (Defs.' Reply ¶ 39.) Ben-Yashar testified that East Coast holds annual shareholder meetings at its corporate attorney's office, and that there is a corporate book containing the minutes from those meetings. (Defs.' Reply ¶ 37.) Defendants also assert that East Coast and National maintain separate payrolls and accounting systems, have separate management teams, have separate clients and contractual obligations, and have different "business processes." (Defs.' Reply ¶ 39.) Ben-Yashar admitted at his deposition, however, that East Coast and National shared a payroll in 2008. (Ben-Yashar Dep. 22:7-22.) Ben-Yashar also testified that East Coast and National share some staff, an office, and a single accounting department. (Ben-Yashar Dep. 137:4-9, 139:13-20, 145:6-9.) Defendants admit that some employees work for both East Coast and National, but allege that those employees receive a paycheck from just one company, and that inter-company transfers and invoices are documented

---

[9]    O. Casey was a shift leader who responded to a Family Dollar complaint without Ben-Yashar's approval. (Ben-Yashar Dep. 207:1-15.)

"in the books" of each company. (Defs.' Reply ¶ 38.)

East Coast's assets in 2008, according to Ben-Yashar, consisted of a checking account used for "payables," some office furniture, and its "receivables." (Ben-Yashar Dep. 13:5-24, 14:1-12.) In its tax returns for 2008, East Coast reported $2,080,129 in assets, $5,838,148 in gross profits, $981,769 in ordinary business income, and liabilities of roughly $500,000. (East Coast Tax Returns, Ex. B to Defs.' Mot. for Summ. J. on Counts I and VI [104].) In 2009, East Coast reported $2,074,347 in assets, $6,568,692 in gross profits, $1,024,385 in ordinary income, and liabilities of approximately $1,200,000. (East Coast Tax Returns at 081995.) In 2012, East Coast reported roughly $3,300,000 in assets, of which nearly $2,000,000 consisted of inter-company transfers. (East Coast Balance Sheet, Ex. P to Defs.' 56.1, at 082511.)

East Coast was not a shareholder of National, but Plaintiff asserts that Ben-Yashar caused East Coast to "capitalize" funding for National. (Pl.'s Addnl. ¶ 38.) Ben-Yashar admitted at his deposition that East Coast had made a capital contribution to National, but he could not recall the details of the contribution. (Ben-Yashar Dep. 20:15-23.) In its own tax returns for 2008, National reported $435,924 in assets, gross profits of $450,986, ordinary business losses of $76,654 and liabilities of roughly $500,000. (National Tax Returns, Ex. C. to Defs.' Mot. for Summ. J. on Counts I and VI.) In 2009, National reported losses of more than $240,000 and total assets of just $8,412, although it had $173,138 in gross profits and liabilities of roughly $325,000. (*Id.*) In 2012, National had $779,085.30 in total assets, of which more than $200,000 consisted of inter-company transfers from other Ben-Yashar enterprises. (National Balance Sheet, Ex. P to Defs.' 56.1.)

20

## DISCUSSION

A motion for summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is improper if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; the judge's function at summary judgement "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255; *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The court considers the pending motion with these standards in mind.

### A.    Common Law Fraud

Illinois state law governs Plaintiff's substantive claims brought, as here, under diversity jurisdiction. 28 U.S.C. § 1332. Under Illinois law, common law fraud requires (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intended to induce the other party to act; (4) action by the other party in justifiable reliance; and (5) damage resulting from reliance. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009)*; Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, Nos. 112479, 112501, 2012 IL 112479, 973 N.E.2d 880, 889 (Aug. 9, 2012).[10] Claims of fraud between contracting parties are distinct from claims for breach of contract. Fraud claims are subject to heightened pleading requirements,

---

[10]    Current Seventh Circuit case law reflects two different lines of authority about the scienter requirement for common law fraud in Illinois. The court relies on the standard articulated in *Trade Fin. Partners* and by the Illinois Supreme Court in *Jane Doe-3*: knowledge or belief that the statement was false when it was made. 573 F.3d at 413; 973 N.E.2d at 889. The court notes, however, that other Seventh Circuit opinions rely on a broader standard: "the defendant knew or believed that the statements were false, or . . . were made with a reckless disregard of whether they were true or false." *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 732 n.4 (7th Cir. 2008) (citing *Kapelanski v. Johnson*, 390 F.3d 525, 530-31 (7th Cir. 2004)).

FED. R. CIV. P. 9(b), and in Illinois, fraud must be proved by clear and convincing evidence, while breach of contract may be proved by a mere preponderance of the evidence. *Extra Equipamentos*, 541 F.3d at 724. Thus, more is required to prove fraud than to prove breach of contract.

To prove common law fraud, a claimant must demonstrate that his or her reliance on false representations was justified. *Trade Fin. Partners*, 573 F.3d at 413. A party is not justified in relying on representations "when he has ample opportunity to ascertain the truth of the representations before he acts," such as in a contract case where the false representations are undercut by the contract itself. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882 (7th Cir. 2005) (quoting *Elipas Enters., Inc. v. Silverstein*, 243 Ill. App. 3d 230, 237, 612 N.E.2d 9, 13 (1st Dist. Ill. App. 1993)). If the falsity of the representations was unknowable by the fraud claimant, however, the claimant does not violate the "so-called due diligence rule." *Id.* (internal quotation marks and citations omitted); *see also BCWC LLC v. Reading Rock, Inc.*, No. 07 CV 2356, 2007 WL 2955573, *3-4 (N.D. Ill. Oct. 10, 2007).

Plaintiff identifies four false statements of material fact made by Defendants before the Affiliate Agreements were signed, and two made after they were signed. (2d Am. Compl. ¶¶ 60, 66.) First, Plaintiff alleges that East Coast falsely stated that it had a national presence and had performed snow removal services nationwide. Defendants argue that East Coast's claims of a national presence, if Ben-Yashar even made such claims, were (1) an accurate description of East Coast's work for hundreds of stores in multiple states; or (2) "mere puffery, not actionable as fraud." (Defs.' Mem. at 10.) But this court finds that there is ample evidence of a genuine dispute about whether Ben-Yashar told Plaintiff that Defendants had a "national" presence, and the court is not convinced that describing East Coast's previous work as "national" in scope is accurate. Nor would such claims amount to mere puffery, which "is ordinarily defined as empty superlatives on which no reasonable person would rely." *F.T.C. v. Trudeau*, 579 F.3d 754, 765 (7th Cir. 2009) (internal quotation marks and citations omitted). SMS alleges that it specifically sought

out a provider with a national presence who had experience servicing customers across regions of the United States. At the summary judgment stage, this court must assume that Defendants' alleged claims of national experience could have influenced SMS to rely on them.

Defendants urge that whether East Coast had a national presence is not "material"; they note that SMS was operating under tight time restrictions before the snow season began and "common sense dictates a modicum of due diligence or basic inquiry would have occurred" if SMS truly cared whether East Coast actually had national experience. (Defs.' Mem. at 12.) Any alleged misrepresentations by Ben-Yashar could not reasonably have been relied on by Plaintiff, Defendants argue, given Plaintiff's failure to investigate Defendants' background before signing the Agreements. The court is not persuaded. Arguing that Plaintiff had no time to find an alternative partner or that Plaintiff should not have believed Defendants' representations without further proof is not sufficient to show, for summary judgment purposes, that Defendants' alleged misrepresentations to Plaintiff were not fraudulent. Plaintiff's fraud claims are arguably undermined by the fact that Plaintiff continued to pursue a renewal agreement with Defendants well after Plaintiff should have been aware that Defendants had misrepresented key facts, and by Plaintiff's failure to investigate Defendants more thoroughly before contracting with them. Nevertheless, Plaintiff has offered evidence sufficient to reach a jury on this claim.

Second, Plaintiff alleges that Ben-Yashar falsely stated that his proposed pricing structure was a "standard and national" pricing model used on a nationwide basis in the industry. (Pl.'s Addnl. ¶ 11.) Defendants argue that even if Ben-Yashar did make such statements, they were "mere expressions of opinion," not actionable as fraud. (Defs.' Mem. at 13.) Defendants contend that Plaintiff should have known that there was no standard pricing model, given Levadnuk's research into other providers. (*Id.*; Levadnuk Dep. 116:4-8.) Defendants also rely, again, on Plaintiff's failure to investigate Defendants' background. (Defs.' Mem. at 14.)

23

Ben-Yashar's alleged claims of a "standard and national" pricing model may well have been material misrepresentations, and any "defense" that SMS should not have trusted him is unappealing. The court nevertheless concludes that SMS could not reasonably have relied on any oral representations concerning snow removal pricing. SMS was a business dealing at arm's length with Defendants, and the actual pricing model Defendants used was clearly set forth and agreed to by SMS in the Affiliate Agreements. Defendants may well have violated those provisions—a matter relevant to SMS's breach of contract claims. But Ben-Yashar's claims that the pricing model fit a national "standard" do not qualify as fraud.

Third, Plaintiff alleges that Ben-Yashar falsely represented that East Coast had performed snow removal services for Rite Aid, and that East Coast used a per-square-foot pricing model for Rite Aid. Defendants again contend that there is insufficient evidence to conclude that these alleged misrepresentations were material, and that a reasonable person would not have relied upon them given Plaintiff's failure to inquire about Defendants' background and Levadnuk's awareness of other pricing models. (Defs.' Mem. at 15.) Again, the court disagrees. Ben-Yashar's false assurances that his companies had performed snow removal services for a national retail carrier may well have been instrumental in SMS's decision to enter into the Affiliate Agreements with Defendants. Nor is this court persuaded that Plaintiff has not submitted sufficient evidence to show a dispute about what Ben-Yashar represented to SMS. Plaintiff cites *Packman v. Chi. Tribune Co.* to argue that assertions that are unsupported by evidence in the record cannot be used to create a genuine issue of material fact. 267 F.3d 628, 645 (7th Cir. 2001). In this case, there is testimonial evidence that Ben-Yashar claimed East Cost had performed snow removal for Rite Aid. Given the parties' different versions of the facts, each supported by testimony, summary judgment on this claim is inappropriate.

Fourth, Plaintiff alleges that Defendants falsely claimed to have the experience and ability to execute the Affiliate Agreements. Plaintiff asserts that Ben-Yashar misrepresented East Coast's

24

existing technology to SMS, though he knew that Defendants had never engaged in a project of the size and scope of the Family Dollar project. (Pl.'s Addnl. ¶¶ 8, 10, 21.) Ben-Yashar himself admitted to hiring Sturm to "build up" East Coast. (Defs.' Reply ¶ 23.) Defendants reply that there is no evidence that they lacked the ability to handle the Family Dollar project because they did, in fact, perform the required services "us[ing] existing infrastructure." (Defs.' Mem. at 16.) Defendants argue that, "at a minimum, there is no evidence any Defendant knew or believed the statement [that Defendants had the necessary infrastructure to perform] to be false." (Defs.' Mem. at 16.) But Plaintiff asserts that Ben-Yashar orally told Levadnuk and Rothman around October 2008 that Defendants possessed technology, such as an integrated voice-recognition system, that he knew they did not have. The gap between the realities of Defendants' capabilities and the alleged representations Defendants made provides the necessary evidence to create a genuine triable issue of material fact about whether Defendants knowingly misrepresented their capabilities. *See L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 573 (7th Cir. 1993) (company's representation about its computer system was enough to survive summary judgment on common law fraud claim "if [the representation] deceptively and purposefully omits material information."). The fraud claim resting on this fourth allegation survives summary judgment.

Fifth, Plaintiff alleges that Defendants falsely represented throughout the 2008-2009 snow season that schematic diagrams of the Family Dollar parking lots existed. (2d Am. Compl. ¶ 66.) Defendants contend that the Agreements did "not require a blueprint or a surveyor diagram." (Defs.' Mem. at 17.) They also note that they did produce schematic diagrams of several stores to SMS. (Defs.' Mem. at 17.) But neither of these points addresses Plaintiff's assertion that Defendants falsely represented they had diagrams, required or not, for all of the stores. Levadnuk testified that Ben-Yashar told him repeatedly by phone that he "would get [Sturm] to send those [diagrams]" to Levadnuk. (Levadnuk Dep. 478:6-23.) Levadnuk continued requesting diagrams from Ben-Yashar and Sturm by e-mail as late as March 2009, before Sturm admitted in a

25

March 27, 2009 e-mail that the diagrams did not exist. (March 14, 2009 e-mail from Levadnuk to Ben-Yashar, Ex. 31 to Pl.'s 56.1; March 27, 2009 e-mail from Sturm to Levadnuk.) Ben-Yashar apparently began to argue that diagrams were not required only after Plaintiff discovered that they did not exist.

Nor are Defendants correct that Plaintiff did not rely on Defendants' representations about whether the diagrams existed. (Defs.' Mem. at 18.) It is indeed curious that (1) Plaintiff pressed Defendants for a new agreement in 2009 even after so many problems and misrepresentations had been exposed; (2) Plaintiff alleged fraud only after Defendants refused to renew the partnership; and (3) Plaintiff has offered few specific details about when and where the allegedly fraudulent statements were made. Nonetheless, it is premature at summary judgment to decide that Plaintiff would not have demanded diagrams if Defendants' bills had reflected accurate information about lot square footages.

Last, Plaintiff alleges that Defendants falsely claimed inaccurate square footages on bills to SMS. (2d Am. Compl. ¶ 66.) Defendants argue that, to qualify under common fraud, inaccuracies in their billings must have been intentional; such an argument is defeated, in Defendants' view, by the evidence that Defendants did make efforts to correct errors identified by SMS. (Defs.' Mem. at 18-19.) Plaintiff counters that the frequency and pervasiveness of the errors, combined with Defendants' failure to correct them on their own, permit the inference that Defendants' inaccurate billings actually were intentional, rather than innocent oversights. (SMS Assist L.L.C.'s Mem. in Opposition to Defs.' Mot. for Summ. J. on Counts I and VI of 2d Am. Compl. [122], hereinafter "Pl.'s Mem.", at 9-10.)

It may well be that the billing problems were good-faith mistakes, or were functions of carelessness or incompetence rather than intentional errors. On this record, however, the court concludes that disputes of material fact preclude summary judgment in favor of Defendants on this issue, as well. Plaintiff argues that Defendants "knowingly sent duplicates, [and] sent wrong

information" in their invoices, thereby committing fraud, and has offered sufficient evidence to reach a jury on this claim. (Levadnuk Dep. 415:6-8.)

### B. Alter-Egos

Plaintiff alleges that East Coast and National are mere alter-egos of Ben-Yashar, and that Ben-Yashar should be held personally liable for their actions. (2d Am. Compl. ¶¶ 96-103.) Ordinarily, corporations are legal entities distinct from their shareholders, officers, and directors, even in cases where there is but a single shareholder. *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (citing *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 1004, 415 N.E.2d 560, 563 (1st Dist. Ill. App. 1980)). The courts will in some circumstances hold the owner liable for a corporation's acts, but piercing the corporate veil is disfavored unless the corporate form is "used as a cloak or cover for fraud or illegality." *Wachovia Sec., LLC v. Banco Panam., Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) ("[I]n general, courts are reluctant to [pierce the corporate veil].").

The separate existence of a corporation will be disregarded only when (1) such unity of interest and ownership exists that the separate personalities of the corporation and parties who compose it do not exist; and (2) adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances. *Wachovia*, 674 F.3d at 751. The mere prospect of an unsatisfied judgment does not qualify as an injustice. *Judson Atkinson Candies*, 529 F.3d at 381 n.1. Illinois courts weigh various factors when applying this test, including: failure to comply with corporate formalities or maintain adequate corporate records; commingling of funds or assets; undercapitalization; failure to maintain an arms-length relationship with related entities; non-functioning of the other officers or directors; diversion of assets from the corporation to the officer to the detriment of other creditors; and whether the corporation is a "mere facade" for dominant shareholders. *Van Dorn Co. v. Future Chem. and Oil Corp.*, 753 F.2d 565, 570 (7th Cir.

1985); *Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1023 (N.D. Ill. 2009). Although the veil-piercing analysis involves questions of fact, deciding whether adhering to the fiction of a separate corporate entity would promote injustice is a question for the court, and this court has discretion to decide whether to pierce the corporate veil. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736, 738 (7th Cir. 2004).

As evidence of each company's purported independence, Defendants rely on Ben-Yashar's testimony that East Coast complies with corporate formalities by holding shareholder meetings and keeping a corporate book with the minutes, and on East Coast and National's separate registrations with the IRS and Secretary of State. While National and East Coast were referred to interchangeably by both Ben-Yashar and SMS in the record and more evidence on this point would be helpful, it appears that Defendants did observe corporate formalities. Similarly, Ben-Yashar's undisputed testimony that he was only paid a salary by East Coast and National, along with expenses toward his travel and cell phone, suggests that there was no diversion of corporate assets by him. Defendants also contend that East Coast and National do not commingle funds: the two companies have separate checking accounts, and intercompany transfers between the two entities are documented in the books of each company. *See Judson Atkinson Candies*, 529 F.3d at 380 (transfers between companies accounted for in each company's books not commingling funds). Ben-Yashar admitted that the two companies shared staff, payroll, and an accounting department; and in 2012, more than a quarter of each company's assets consisted of inter-company transfers from Ben-Yashar enterprises. These facts suggest intermingling of assets between East Coast and National, but not an intermingling of corporate assets between Ben-Yashar and East Coast or National.

Nor, Defendants argue, is there any evidence that East Coast and National are undercapitalized: as of January 2012, East Coast had total assets of more than $3,300,000, and National had total assets of more than $779,000. A company is undercapitalized when it lacks

28

sufficient equity to operate without considering loaned funds or encumbered assets. *Wachovia*, 674 F.3d at 752. The fact that a corporation is losing money does not by itself establish that the corporation is undercapitalized. *Judson Atkinson Candies*, 529 F.3d at 379. In reply, SMS notes Ben-Yashar's admission that East Coast's only assets in 2008 were a checking account used for payables and some office furniture. While each company had significant assets, Plaintiff contends, without much explanation, that "Defendants' descriptions of the capitalization and financial wherewithal of the corporations are misleading" and those assets were "not at a level to support the magnitude of business [Defendants] committed to execute" through the Family Dollar project. (Pl.'s Mem. at 25.) More evidence on this issue would undoubtedly be helpful to the court. Given the financial information in the record, however, Plaintiffs have not provided sufficient evidence of undercapitalization to overcome the presumption against piercing the corporate veil.

Finally, SMS contends that Defendants failed to maintain an arms-length relationship. Thus, for example, Ben-Yashar caused National to capitalize East Coast even though East Coast did not have a stake in National. The crux of SMS's alter-ego argument is that East Coast and National were "mere facades" for Ben-Yashar, who, alone or with his wife, is the only owner, Board Member, and stockholder of each company. Ben-Yashar's uncertainty concerning his wife's relationship to East Coast indicates that she lacks an independent functioning role as a member of its Board. Defendants themselves admit that Ben-Yashar directs and manages East Coast and National's decisions, but they argue that this fact "suggests nothing more than [that he] is an active president of two small companies." (Defs.' Mem. at 6) (citing *First Place Bank v. Skyline Funding, Inc.*, No. 10 CV 2044, 2011 WL 3273071 (N.D. Ill., July 27, 2011)).

The parties' dueling applications of the alter-ego factors in the case demonstrate well why "[p]iercing the corporate veil is not a simple matter under Illinois law," *APS Sports*, 299 F.3d at 628. Ben-Yashar's ownership and total control of both companies, combined with the intermingling of their funds and responsibilities by him, shows some unity of interests between him and the

companies. At the same time, East Coast and National observed corporate formalities; did not commingle their assets with those of Ben-Yashar; did not use corporate assets on Ben-Yashar beyond paying his salary, travel costs, and phone costs; and were capitalized with significant assets. As described earlier, SMS knew that Ben-Yashar exercised total control over both companies: Rothman only agreed to contract with National "as long as East Coast supports [the new company], and [Ben-Yashar] supports it." (Rothman Dep. II 147:17-24.) The fact that SMS knew from the very start of their interactions with Defendants that Ben-Yashar was in total control of both companies further argues against a finding that injustice would result from treating East Coast and National as separate from Ben-Yashar. *See Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 703 (7th Cir. 2010) (no fraud when plaintiff "knew that [defendant] is a husk without any corn inside [and] . . . [plaintiff] went in with eyes open"). Protecting Ben-Yashar from personal liability though he would have ultimately received any profits from National and East Coast as their owner is not an injustice—it is the whole goal of the corporate form. *See Fusion*, 614 F.3d at 703 (plaintiff corporation's failure to protect itself through negotiating for a guaranty from defendant corporation is not a reason to "warp the law of investors' liability, after the fact, to protect commercial entities that failed to protect themselves"). Plaintiff, while uncovering evidence that each company was dominated by Ben-Yashar, has not made a substantial showing that East Coast and National are mere "dummies" or "shams" for him. *Pederson v. Paragon Pool Enterprises*, 214 Ill. App. 3d 815, 820, 574 N.E.2d 165, 167 (1st Dist. Ill. App. 1991). Nor has Plaintiff shown that declining to pierce the corporate veil would sanction an injustice: Plaintiff knew throughout its dealings with Defendants that Ben-Yashar exercised near-total control over each entity, and failed to research Defendants' background further. Plaintiff's alter-ego claim lacks merit to survive summary judgment.

## CONCLUSION

30

Defendants' motion for summary judgment as to Counts I and VI [104] is denied as to Count I and granted as to Count VI.

ENTER:

Dated:  December 21, 2012

_____
REBECCA R. PALLMEYER
United States District Judge